**FAR WEST FEDERAL BANK, S.B.,
et al., Plaintiffs,**

v.

**DIRECTOR, OFFICE OF THRIFT
SUPERVISION, et al.,
Defendants.**

**Civ. No. 90–103–PA.**

United States District Court,
D. Oregon.

June 8, 1990.

Barnes H. Ellis, Christine Kitchel, Stoel, Rives, Boley, Jones & Grey, Portland, Or., Wesley G. Howell, Jr., John C. Millian, Gibson, Dunn & Crutcher, Washington, D.C., for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., Leslie H. Southwick, Deputy Asst. Atty. Gen., Charles H. Turner, U.S. Atty., Herbert C. Sundby, Asst. U.S. Atty., Brook Hedge, Theodore C. Hirt, Jeffrey S. Gutman, Gary W. Herschman, Dept. of Justice, Civ. Div., Washington, D.C., for defendant FDIC.

Eugene M. Katz, Acting Chief Counsel, Thomas J. Segal, Associate Chief Counsel, Aaron B. Kahn, Elizabeth R. Moore, Sr. Trial Attys., Office of the Chief Counsel, Office of Thrift Supervision, Washington, D.C., for defendant Director, Office of Thrift Supervision.

## OPINION

PANNER, Chief Judge.

Plaintiffs, Far West Federal Bank (Far West) and a number of investors (Investors), bring this action against the Director of the Office of Thrift Supervision (OTS), the Federal Home Loan Bank Board (FHLBB), the Federal Home Loan Bank of Seattle (FHLB–Seattle), the Federal Deposit Insurance Corporation (FDIC), and the Federal Savings and Loan Insurance Corporation (FSLIC). The legal issue before me now is whether a 1987 agreement (Conversion Agreement) between Far West, the Investors, and predecessor agencies to OTS, was abrogated by the Financial Institutional Reform, Recovery and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183 *et seq.* (1989).

On May 2, 1990, plaintiffs moved for a preliminary injunction and temporary restraining order (TRO). After a hearing on May 3, 1990 at which all parties appeared, I granted plaintiffs' motion with an opinion and TRO filed on May 4, 1990, 738 F.Supp. 1559, and scheduled a preliminary injunction hearing. The parties stipulated to extending the TRO until 10 days after a preliminary injunction hearing. The hearing took place on June 4, 1990. The parties submitted no additional evidence.

In its motion for a TRO and preliminary injunction, Far West sought an order prohibiting OTS from: (1) enforcing regulatory restrictions inconsistent with the Conversion Agreement; and (2) enforcing restrictions imposed by an April 24, 1990 letter from OTS to Far West. After the

TRO issued, Far West amended its motion for preliminary injunction, seeking two additional orders: (3) prohibiting OTS from calculating Far West's Loan–to–One Borrower (LTOB) limit inconsistent with the pre-FIRREA calculation; and (4) prohibiting OTS from publicly identifying Far West as targeted for takeover by the Resolution Trust Corporation.

Defendant FHLB–Seattle does not oppose plaintiffs' motion for preliminary injunction. FHLB–Seattle wants to continue to honor the Conversion Agreement, and "would be pleased" to have the preliminary injunction entered against it. *See* FHLB–Seattle Non-opposition to Motion for Preliminary Injunction.

At the preliminary injunction hearing, I ruled from the bench on all but one issue, which I took under advisement, with this opinion to follow. I granted plaintiffs' amended motion for preliminary injunction in part, for the same reasons I granted the motion for a TRO. I denied plaintiffs' motion to enjoin OTS from publicly identifying Far West as targeted for takeover. I denied plaintiffs' motion to decide the preliminary injunction under seal, because the matters at issue have been well-publicized, in part by Far West itself, and sealing the record would serve no important purpose. I ordered a continuation of the $25,000 undertaking I previously ordered in the TRO. I took under advisement plaintiffs' motion to require OTS to use pre–FIRREA calculations of Far West's LTOB limit. I now deny this motion.

My May 4, 1990 opinion on the TRO sets forth the facts and applicable law. I do not repeat them. There is no dispute about facts relevant to this motion. The parties presented legal arguments now before me on the motion for TRO. I address these now and specify my reasons for finding irreparable harm.

## LEGAL STANDARD

A preliminary injunction may issue to a party that demonstrates either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) that serious questions are raised and the balance of hardship tips in its favor. *Arcamuzi v. Continental Airlines Inc.,* 819 F.2d 935, 937 (9th Cir.1987). "These two formulations represent two points on a sliding scale on which the required degree of irreparable harm increases as the probability of success decreases." *Id.* If the plaintiff shows no chance of success on the merits, the injunction should not issue. *Id.* The court must also consider the public interest when that interest may be affected. *Caribbean Marine Serv. v. Baldrige,* 844 F.2d 668, 674 (9th Cir.1988); *Los Angeles Memorial Coliseum Comm'n v. National Football League,* 634 F.2d 1197, 1200 (9th Cir.1980). There must be some showing of irreparable harm for an injunction to issue. *Los Angeles Memorial Coliseum Commission,* 634 F.2d at 1202.

## DISCUSSION

### I. Irreparable Harm

My reasons for concluding that Far West has shown the possibility of irreparable harm were not included in my prior written opinion. Far West asserts that as a result of the threatened restrictions on its operations, and the potential that the Conversion Agreement will be set aside, it has begun to and will continue to lose key customers, employees, and investors. Far West also points to the possibility of harm to its business reputation. Defendants do not dispute this, but contend that this type of harm is compensable with money damages should Far West ultimately prevail. I disagree.

First, the potential damages to the Investors and Far West are virtually impossible to measure. The Investors assisted in recapitalizing Far West, based on expectations that the Conversion Agreement would govern the operations and regulation of Far West for a number of years. Estimating the difference in return to investors with and without the Conversion Agreement, especially in light of entirely new and untested rules, would be utterly speculative.

Second, OTS seeks to take regulatory action against Far West during a period of a strong public concern and negative publicity about problems of thrifts. The very fact of OTS' action can tarnish Far West's

business reputation in a manner that money cannot alter. Third, the loss of key employees and customers can create a long-term injury to the business that money alone cannot repair.

## II. Calculation of the LTOB Limit

■ Far West contends that the calculation of its LTOB limit should be made based on pre-FIRREA methods because it is implicitly required by the Conversion Agreement. I disagree.

### A. *Background*

The LTOB limit is a cap on the amount of credit a federally insured institution can extend to a single borrower or related interests. The purpose of the LTOB limit is to reduce the chances that financial problems of a single, large borrower will threaten the financial stability of an institution.

The dispute about the LTOB arises from the "credit facility", which is Far West's $1.5 billion line of credit with the FHLB–Seattle. The credit facility was established by the Conversion Agreement as part of the recapitalization plan. The Conversion Agreement provides that the credit facility is to be accounted for as an intangible asset. The Conversion Agreement also provides that intangible assets are to be included in the calculation of Far West's "regulatory capital", notwithstanding subsequent changes in the definition of regulatory capital.

The Conversion Agreement does not specify a method to calculate Far West's LTOB. It merely defines regulatory capital. The pre–FIRREA method of calculating the LTOB limit was established by regulation as a percentage of regulatory capital. Defining the credit facility as an intangible asset and including intangible assets in regulatory capital increased Far West's LTOB above what it would otherwise be. Increasing the LTOB limit permitted Far West to make more profitable loans than it could with a lower LTOB limit.

In a December 30, 1987 letter from the FHLBB to Far West, which is part of the Conversion Agreement, FHLBB said

the Bank Board deems Far West to be in compliance with ... [specified insurance regulations] *for all purposes* ... if Far West is in compliance with its "Modified Regulatory Capital Requirements."

Appendix to Opposition to Defendant Motion to Dismiss, Exhibit 2, at 1. The letter also says it is not a regulatory forbearance or waiver of requirements other than those set forth in the letter. *Id.*

FIRREA did away with using regulatory capital to calculate the LTOB limit. Section 301 of FIRREA added a subsection to the Home Owner's Loan Act of 1933 (HOLA), related to the LTOB limits:

(u) LIMITS ON LOANS TO ONE BORROWER

(1) IN GENERAL–Section 5200 of the Revised Statutes [12 U.S.C. § 84] shall apply to savings associations in the same manner and to the same extent as it applies to national banks.

HOLA § 5(u), 12 U.S.C. § 1464(u)(1). Under 12 U.S.C. § 84(a), LTOB limits for national banks are based on percentages of "unimpaired capital and unimpaired surplus". Banking regulations exclude intangible assets from the calculation of unimpaired capital and unimpaired surplus. *See* OTS and FDIC's Memorandum in Opposition at 45–46 n. 27.

In its April 24, 1990 letter, OTS notified Far West that its LTOB limit will be $500,-000, without regard to the credit facility, or its regulatory capital. Far West contends that this restriction implicitly violates the Conversion Agreement because the Conversion Agreement deems Far West "in compliance ... for all purposes" if it meets the requirements established in the Conversion Agreement.

### B. *Discussion*

Plaintiffs do not dispute that Congress, if it wanted to, could have abrogated the Conversion Agreement. They just contend that Congress did not intend to do so. I agree, assuming the Conversion Agreement is a contract. However, plaintiffs take that argument a step further, contending in effect that Congress intended to preserve their expectations about Far

West's LTOB limit. I disagree. To accept Far West's argument would be to read a provision into the Conversion Agreement that simply is not there. Even if such a provision were there, it would be abrogated by crystal clear congressional action changing LTOB limit calculations.

As OTS argues, the *law* has changed. FIRREA says that the LTOB limit for thrifts is to be the same as for national banks. FIRREA is not silent, vague, or equivocal about modifying the LTOB calculation. In contrast, the Conversion Agreement does not expressly address the LTOB limit calculation. FIRREA does not conflict with the Conversion Agreement on this issue.

Although, as Far West argues, the parties may have expected that the Conversion Agreement would increase its LTOB limit, the agreement does not expressly address that. The Conversion Agreement does provide that it is governed by federal law, and does not require any unlawful action or inaction. Federal law now requires that the LTOB limit be calculated without reference to regulatory capital. OTS is not attempting to change the definition of regulatory capital established in the Conversion Agreement. It simply does not use it anymore.

It is not necessary to determine whether Congress intended to abrogate an LTOB limit calculation in the Conversion Agreement because there is none. However, even if the Conversion Agreement did include an LTOB limit calculation, the result would be the same because Congress has clearly expressed its intent to abrogate it. I deny Far West's motion for preliminary injunction to the extent that it seeks to enjoin OTS from enforcing FIRREA-based LTOB limit calculations.

### III. OTS's Statutory Authority to Restrict Far West's Activities after Rejecting its Plan

■ Far West raises a new argument as an independent ground for enjoining the enforcement of the April 24, 1990 letter. It contends that OTS lacks statutory authority to enforce new restrictions after rejecting Far West's Capital Plan. I disagree.

### A. *Background*

The April 24, 1990 OTS letter to Far West, rejecting the Conversion Agreement as a Capital Plan, also establishes certain operating restrictions on Far West, effective immediately: (1) Far West may not increase its assets beyond the amount held on April 24, 1990; and (2) Far West is subject to all limitations and restrictions contained in a Consent Agreement, attached and referred to in the letter.

OTS demanded that Far West execute and return the Consent Agreement by May 11, 1990. The Consent Agreement establishes a number of stringent FIRREA-based operating restrictions on Far West. The letter cites as authority for the restrictions a regulation which provides that if the Director disapproves a Capital Plan, the thrift "must comply with any other restrictions or limitations set forth in the written notice of . . . [disapproval of the Plan]." 12 CFR § 567.10(a)(4), *as republished in* 54 Fed.Reg. 49411, 49661 (Nov. 30, 1989).

Section § 301 of FIRREA, amending HOLA § 5(t)(6), establishes a transition period:

> (6) Consequences of Failing to Comply with Capital Standards.—
>
> (A) Prior to January 1, 1991.—Prior to January 1, 1991, the Director—
>
> (i) *may* restrict the asset growth of any savings association not in compliance with capital standards; and
>
> (ii) *shall* . . . require any savings association not in compliance with capital standards *to submit a [capital] plan*. . . .

(emphasis supplied.)

The post-January 1, 1991 provision is different:

> (B) On or After January 1, 1991.—On or after January 1, 1991, the Director—
>
> (i) *shall* prohibit any asset growth by any savings association not in compliance with capital standards [with some exceptions]; and
>
> (ii) *shall* require [the non-complying savings associations] *to comply with a capi-*

tal directive issued by the Director (which may include such restrictions ... as the Director determines to be appropriate).

(emphasis supplied.) Until January 1, 1991, the statute requires a non-complying thrift only to submit a plan, but after January 1, 1991, the statute requires the non-complying thrift to comply with an OTS directive.

FIRREA gives the OTS Director broad regulatory powers. Section 5(t)(6)(A) of HOLA, as amended by § 301 of FIRREA, grants the OTS substantial authority to monitor and restrict the operations of capital-deficient thrifts, and provides that § 5(t)(6) "does not limit any authority of the Director under other provisions of law." HOLA § 5(t)(6)(F), 103 Stat. at 308, 12 U.S.C.A. § 1464(t)(6)(F). Other sections of FIRREA grant OTS substantial regulatory authority. For example, FIRREA creates: 1) the Director's general authority to "require all savings associations to achieve and maintain adequate capital by ... using such methods as the Director determines appropriate", HOLA § 5(s)(1)(B), 103 Stat. at 303, 12 U.S.C.A. § 1464(s)(1)(B); 2) the Director's permissive authority to "prescribe such regulations and issue such orders as the Director may determine to be necessary for carrying out [FIRREA], HOLA § 3(b)(2), 103 Stat. at 278, 12 U.S. C.A. § 1462a(b)(2); 3) the Director's mandatory authority to "provide for the examination, safe and sound operation, and regulation of savings associations", HOLA § 4(a)(1), 103 Stat. at 280, 12 U.S.C.A. § 1463(a)(1); and 4) the Director's permissive authority to "issue such regulations as the Director determines to be appropriate to carry out the responsibilities of the Director or the [OTS]", HOLA § 4(a)(2), 103 Stat. at 280, 12 U.S.C.A. § 1463(a)(2).

## B. *Discussion*

Far West contends that imposing restrictions before January 1, 1991 conflicts with the statutes, and lacks statutory authority. I disagree.

First, OTS has clear statutory authority to restrict asset growth. OTS argues that the restrictions in the Consent Agreement are designed to do just that. Second, and more significant, FIRREA contains a number of provisions granting the Director broad powers to promulgate regulations, issue directives, and enforce the provisions of FIRREA.

Although the statute that Far West cites imposes different requirements pre- and post-January 1, 1991, those requirements do not conflict or contradict any of the broader powers given the Director and OTS. FIRREA provides ample statutory authority for the Director to impose operating restrictions deemed necessary to enforce the provisions of FIRREA, by regulation or order, after rejecting a capital plan and before January 1, 1991. If the Conversion Agreement were abrogated by FIRREA, I would conclude that OTS has the statutory authority to impose operating restrictions on Far West prior to January 1, 1991, to enforce the provisions of FIRREA.

## IV. Whether OTS' Action Should be Set Aside under the Administrative Procedure Act as Arbitrary and Capricious

■ Far West has raised another independent ground for enjoining enforcement of the April 24, 1990 letter. It contends that OTS acted arbitrarily and capriciously and its action should be set aside under § 706(2)(A) of the Administrative Procedure Act, which permits a court to enjoin agency action that is arbitrary and capricious. I disagree.

I find no substance in Far West's argument. The only support Far West offers is a characterization of OTS's action as "wholly irrational". Far West paints itself as the innocent victim of a "supposedly beneficial process run amok."

This assertion is meritless. It is undisputed that Far West has not, and cannot hope to meet the FIRREA capital requirements. It is OTS's job to make sure it does. Even if OTS is ultimately determined to be in error on the law, its actions, especially in light of its strong statutory authority, can hardly be characterized as arbitrary and capricious.

## V. Whether the Conversion Agreement is a Waiver of Sovereign Police Powers

OTS contends that the Conversion Agreement cannot be a valid contract enforceable against the government because it is "well-established that 'governmental powers cannot be contracted away'". *North American Commercial Co. v. United States*, 171 U.S. 110, 137, 18 S.Ct. 817, 828, 43 L.Ed. 98 (1898). Plaintiffs did not have sufficient opportunity to brief this issue. However, their analysis is unnecessary because I reject OTS's argument as inadequate to show that plaintiffs have no likelihood of success on the merits.

■ OTS ignores the principle set forth in its own citation to authority, *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 52, 106 S.Ct. 2390, 2396–97, 91 L.Ed.2d 35 (1985), that police powers can be waived under some circumstances:

> While the Federal Government, as sovereign, has the power to enter contracts that confer vested rights, and the concomitant duty to honor those rights, [citations omitted] we have declined in the context of commercial contracts to find that a "sovereign forever waives the right to exercise one of its sovereign powers unless it expressly reserves the right to exercise that power" in the contract. [citation omitted]. Rather, we have emphasized that "[w]ithout regard to its source, sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction and will remain intact *unless surrendered in unmistakable terms.*"

(citations omitted, emphasis supplied). The government can waive its police power in a contract if it does so clearly and unmistakably. A contract that creates vested rights can be enforced against the sovereign under those circumstances.

I address this question only to evaluate plaintiffs' probability of success on the merits. If the Conversion Agreement is a contract, it may have created vested rights in the Investors. The Conversion Agreement is a waiver and forbearance of regulatory powers. Whether it is sufficiently "unmistakable" to meet stringent standards for a waiver of police powers is an open question. It is a serious enough one to warrant a finding of some likelihood of prevailing on the merits.

## VI. Deference to OTS's Interpretation of FIRREA

■ OTS argues that a court should grant substantial deference to an administrative agency's interpretation of a statute it is authorized to administer. That rule is not an absolute.

In *Fernandez v. Brock*, 840 F.2d 622, 631 (9th Cir.1988), the court, setting out the standard for reviewing an agency's constructions of a statute which it administers, relied on Supreme Court authority and said

> First, we must inquire whether Congress has directly spoken to the precise question at issue. If so, our inquiry is complete, and we will direct the agency to comply with the intent of Congress. If we determine that Congress's intent is unclear, however, we will defer to the agency's interpretation of the statute if it "is based on a permissible construction of the statute." [Citation omitted]. We may not substitute our own construction of a statutory provision for a *reasonable* interpretation made by the administrator of any agency.

(citation omitted, emphasis supplied).

In applying this test to OTS's interpretation of FIRREA, I conclude that deference is unwarranted. In § 401(g) of FIRREA, Congress spoke to the precise question at issue. Under the test set out in *Fernandez*, the inquiry should end and OTS should be directed to comply with congressional intent. Even if I found Congress' intent unclear, I would not defer to OTS's reading of FIRREA in this case. OTS argues that its interpretation of FIRREA need not be the only one, or even the best one to warrant deference, but must only be "reasonable." OTS has properly stated the rule of "reasonableness". I do not find its interpretation of FIRREA reasonable, for the reasons I have already stated.

## CONCLUSION

I GRANT in PART and DENY in PART, plaintiffs' amended motion for preliminary injunction. I GRANT plaintiff's motion to the extent that it requests an injunction against: 1) imposing or enforcing any regulatory restrictions against Far West that are inconsistent with the express terms of the Conversion Agreement; and 2) enforcing the restrictions of the April 24, 1990 letter from OTS to Far West. I DENY the motion to the extent that it requests an injunction prohibiting OTS from imposing FIRREA-based LTOB limits on Far West. I DENY the motion to enjoin OTS from including Far West on its list of thrifts targeted for takeover by the Resolution Trust Corporation. I DENY plaintiffs' motion to consider the preliminary injunction under seal.